## Affidavit of Kevin M. McCusker

I, Kevin M. McCusker, being duly sworn, hereby depose and say:

1. I am a Special Agent for the Federal Bureau of Investigation (FBI) currently assigned to the Boston, Massachusetts Field Office. I have been so employed as a Special Agent for over seven years. Since August 2011, I have been assigned to the Boston Field Office economic crimes squad. Prior to this assignment, I investigated matters concerning National Security in Minneapolis and Boston Field Offices. I hold a Bachelor's degree in Accounting and an inactive Certified Public Accountant license.

2. I am aware that Title 18 of the United States Code, Section 1343, makes it a crime for anyone who has devised or intends to devise a scheme or artifice to defraud, or to obtain money or property by means of false or fraudulent pretenses, representations, or promises, to transmit or cause to transmit by wire communication in interstate commerce, writings, signs, signals, pictures and sounds, for the purpose of executing or attempting to execute such scheme or artifice.

3. My investigation has determined that HICKS has engaged in a scheme to defraud in which he has obtained money through false and fraudulent representations of material fact, made orally and in writing, concerning his background and experience and about how money sent to entities with which he is associated - LOCUST OFFSHORE MANAGEMENT, LLC ("LOCUST MANAGEMENT") and LOCUST OFFSHORE FUND, LTD. ("LOCUST FUND") - has been and will be invested.

4. I make this affidavit in support of a criminal complaint charging Andrey C. Hicks ("**HICKS**") with wire fraud in violation of Title 18, United States Code, Sections 1343 and 2.

5.   The facts stated herein are based on my own personal involvement with this investigation, as well as from information provided to me by other law enforcement officers involved in the investigation. In submitting this affidavit, I have not included each and every fact known to me about this investigation. Rather, I have only submitted those facts which I believe are sufficient to establish probable cause.

### The Locust Offshore Management Scheme

6.   HICKS is 27 years old and his most recent residential address is in Allston, MA.

7.   In March 2011, HICKS established a website, www.locustoffshoremgmt.com, for LOCUST MANAGEMENT, which he incorporated in Delaware in June 2011.

8.   In June 2011, HICKS established savings and checking accounts for LOCUST MANAGEMENT at TD Bank (the "3311" and "0207" accounts, respectively). HICKS is the only person authorized to conduct transactions in those accounts. Investigation to date has uncovered no other bank accounts for LOCUST MANAGEMENT at TD Bank or elsewhere. Investigation has also uncovered no bank or securities trading account for LOCUST FUND.

9.   Also in June 2011, HICKS opened personal savings and checking accounts at TD Bank (the "6220" and "9565" accounts, respectively), using a residential address in Maryland as the accounts' address. On September 20, 2011, HICKS changed the address on the accounts to 10 Concord Avenue, Cambridge, MA, where LOCUST MANAGEMENT has its offices. At the same time, he granted Carmen Hicks, his sister, signature authority on those accounts. Records

2

from Carmen Hicks' American Express account reflect that she works for LOCUST MANAGEMENT at 10 Concord Ave., Cambridge, MA.

10. HICKS is currently leasing office space for LOCUST MANAGEMENT and related entities at 10 Concord Ave., Cambridge, MA. On October 26, 2011, I went to those offices to investigate.

11. In early October 2011, the FBI received a complaint about HICKS from an individual ("Investor A"), who has a place of business located in Washington, D.C. Investor A's name, business address, telephone number, and email address are known to me. I have personally talked to Investor A by telephone and have exchanged emails with him. I have confirmed with bank records that Investor A wired funds to LOCUST MANAGEMENT's bank account.

12. Investor A advised that he met HICKS in August 2011 on an airplane flight. HICKS described himself to Investor A as the owner of the LOCUST FUND, located at 10 Concord Ave., Cambridge, MA. HICKS further represented that he was a Harvard graduate, and had most recently worked at Barclays Bank. HICKS explained that the LOCUST FUND was a very successful stock fund with about $1.5 billion in investments.

13. In early September 2011, Investor A and HICKS communicated by email. HICKS sent Investor A a password to logon to the LOCUST MANAGEMENT website and a "Confidential Information Memorandum" for the LOCUST FUND. Investor A forwarded to the FBI a copy of the "Confidential Information Memorandum" and other documents he received from HICKS, all of which I have reviewed.

14. The "Confidential Information Memorandum" represented that the LOCUST FUND was registered as a British Virgin Islands Business Company. Investigation has determined that no

entity named LOCUST OFFSHORE FUND is registered or incorporated in the British Virgin Islands.

15. The "Confidential Information Memorandum" represented that the LOCUST FUND's auditors were Ernst and Young in the British Virgin Islands. Investigation has determined that neither LOCUST MANAGEMENT nor the LOCUST FUND is a client of Ernst and Young.

16. The "Confidential Information Memorandum" represented that the LOCUST FUND's "prime broker" and "custodian" was Credit Suisse Group in Switzerland. Investigation has determined that neither Credit Suisse Group in Switzerland nor Credit Suisse in the United States has any accounts either for LOCUST MANAGEMENT or the LOCUST FUND.

17. The "Confidential Information Memorandum" represented that HICKS had "attended Harvard University for both his undergraduate ('05) and graduate ('07) degree programs." Investigation has established that HICKS never earned either an undergraduate or graduate degree from Harvard. HICKS was an undergraduate at Harvard beginning in 2001, but was required to withdraw in 2002. After being reinstated, HICKS was again required to withdraw for a second and final time in 2003. HICKS earned a cumulative GPA of 1.819 at Harvard.

18. The "Confidential Information Memorandum" asserted that HICKS had worked in a managing director position at Barclays Capital beginning in the fall of 2009, where he "grew his book nearly two-fold" over just a year, and "expanded his group's assets under management to roughly $16b." Investigation has established that Barclays Capital has never employed HICKS.

19. The Confidential Information Memorandum represented that the LOCUST FUND would pay the manager, LOCUST MANAGEMENT, a "monthly management fee in arrears, equal to two point five percent (2.5%) per annum (0.208% per month) of the net assets attributable to

4

each series of Shares . . .." In addition, it represented that the manager of the LOCUST FUND is entitled to an Incentive Fee based in part on the appreciation in the value of the shares.

20.   In addition to reviewing the "Confidential Information Memorandum," Investor A reviewed information contained on the LOCUST MANAGEMENT website. I have also personally reviewed a cached copy of the homepage of that website, on which it is represented, among other things, that "[t]he firm is primarily engaged in the U.S. equity markets and adheres to a market-neutral, risk averse trading philosophy."

21.   Investor A used the password provided by HICKS to log onto the secure part of the LOCUST MANAGEMENT website. There, he located and reviewed a page which purported to summarize the assets under management by LOCUST MANAGEMENT and the performance of the LOCUST FUND since January 10, 2011. Investor A provided me with a copy of that webpage, dated September 8, 2011, which represented that the LOCUST FUND's beginning balance on January 10, 2011 was $105 million, that the "current balance" was over $1.2 billion, and the return over 167 trading days was 78.59%. It further stated that more than $787 million had been received by the LOCUST FUND for investment, and the return on that investment was over $475 million. Based on my investigation to date, all of the above information concerning assets held by the LOCUST FUND is a fabrication. The LOCUST FUND does not have any account at Credit Suisse Group, as it had represented in the "Confidential Information Memorandum." Furthermore, investigation to date has uncovered no activity by LOCUST MANAGEMENT prior to its incorporation in June 2011, other than the establishment of the website in March 2011. Investigation has not uncovered any LOCUST MANAGEMENT bank account other than the savings and checking accounts opened in June 2011 at TD Bank. Since June 2011, less than $2 million has been deposited to those accounts. As detailed below, those

funds have all been traced and none used for any investment purpose to date. Instead, all were transferred by HICKS to one of his personal bank accounts from which a substantial amount was used to pay for HICKS' personal purchases and expenses.

22. Based on the information provided by HICKS orally and in writing, Investor A decided to invest in the LOCUST FUND. On September 19, 2011, Investor A caused $100,000 to be wired from an account of his to LOCUST MANAGEMENT's "0207" account at TD Bank. Hicks then emailed Investor A confirming the receipt of those funds by LOCUST MANAGEMENT, and further representing that on September 20, 2011 "said funds were transferred to the firm's custodial account and entered into live trading for credit on your behalf."

23. Bank records reflect that Hicks' funds were not transferred to a custodial account and not entered into live trading. On September 20, 2011, the day after Investor A' funds were wired to the LOCUST MANAGEMENT "0207" account, HICKS caused $100,600 to be electronically transferred to his personal TD Bank checking account ("9565"). Just prior to that deposit, there was only $19,273.04 in HICKS' "9565" account.

24. On September 21, 2011, HICKS' caused $55,774.34 to be sent electronically from his personal "9565" account for credit to an American Express account in the name of Carmen Hicks. HICKS is a supplemental member/cardholder on Carmen Hicks' account. American Express records for the month of August 2011 reflect charges attributable to HICKS in the amount of about $124,000, most of which appears to be for personal expenses, including the purchase of tens of thousands of dollars of clothing and jewelry.

25. On September 22, 2011, HICKS caused $25,000 to be transferred electronically from his personal "9565" account back to the LOCUST MANAGEMENT "0207" account. On

September 22, 2011, HICKS caused a $25,000 check to be written on the LOCUST MANAGEMENT "0207" account payable to Waldron Remodeling, with a notation that it was for "remodeling."

26.     On September 22, 2011, HICKS caused $13,000 to be transferred electronically from his personal "9565" account back to the LOCUST MANAGEMENT "0207" account. On September 22, 2011, HICKS caused a $12,000 check to be written on the LOCUST MANAGEMENT "0207" account payable to Onesta Capital Management, with a notation that it was for "HR-cover." Onesta Capital Management appears to be another entity name used by HICKS. An Internet search for Onesta Capital Management located a website for the company (www.onestacapmgmt.com), registered by NIYR DESIGN, address 15621 W. 87th Street, #143, Lenexa, Kansas, with an administrative contact of Andrey Hicks of the same address, and created on or around March 16, 2011. A cached page from the Onesta website is similar in appearance and content to that of the LOCUST website homepage. Investigation on October 26, 2011 revealed that Onesta's offices are located at 10 Concord Ave., Cambridge MA, on the same floor and adjacent to LOCUST MANAGEMENT's offices. According to an Onesta employee, HICKS provided seed money to establish Onesta.

27.     Within days of wiring $100,000 to the LOCUST MANAGEMENT account, Investor A discovered through his own inquiries that the LOCUST FUND was not registered as a British Virgin Islands Business Company, and that HICKS was not a Harvard graduate. Investor A then contacted HICKS and asked him to return his $100,000, using a story that he needed it to cover a margin call on his account. Investor A told HICKS that he would double down on his investment in a couple of weeks. HICKS sent $100,000 back to Investor A. According to Investor A, HICKS considers the $100,000 he gave Investor A to be a loan from the LOCUST

FUND and HICKS expects Investor A to send the money back in the near future. Investor A believes HICKS returned the money because Investor A has contacts who HICKS thinks may be persuaded to invest with him.

28. To repay Investor A, HICKS withdrew $100,000 from his personal "6220" savings account, then immediately re-deposited it to the LOCUST MANAGEMENT "0207" account. He then withdrew $100,000 from the LOCUST MANAGEMENT "0207" account and purchased a bank check for $100,000, which he sent to Investor A.

29. The source of the funds HICKS used to repay Investor A was money sent to the LOCUST MANAGEMENT accounts by Investor A and other people. As with Investor A's money, HICKS had caused most of those deposits to be transferred to one of HICKS' personal accounts.

30. On October 11, 2011, Investor A participated in a consensually recorded telephone call with HICKS. In that call, on October 11, 2011, HICKS told Investor A that Investor A's investment was up over $7,900. HICKS also talked about some other potential investors he was soliciting. HICKS mentioned that he talked to one potential investor about a smaller fund HICKS was going to spin off, but that would still be returning an 80% annual performance similar to the LOCUST FUND.

31. On October 26, 2011, I interviewed persons working with and for HICKS at 10 Concord Avenue, Cambridge, MA. They included HICKS' office manager and a computer software developer. Neither was aware of any investor monies coming into LOCUST MANAGEMENT. The developer stated that he had been working for HICKS and LOCUST MANAGEMENT since September to develop a trading program, but that he had just been doing simulations and no real trading.

32.     HICKS' actions as described above provide probable cause to believe that he is engaged in a Ponzi-type scheme to defraud. HICKS obtained Investor A's money based on false and fraudulent representations about HICKS' background, about the registration of the LOCUST FUND and accounts/funds under its management, and about how Investor A' money would be used. HICKS instead transferred Investor A' money to his personal account and used it to pay for his own personal expenses and purchases, and repaid Investor A from money HICKS obtained in part from others.

**HICKS has obtained over $1.6 million from others using LOCUST MANAGEMENT**

33.     In addition to Investor A's $100,000, ten other large deposits in the form of checks and wires from at least nine individuals and entities were deposited to LOCUST MANAGEMENT's bank accounts from June 2, 2011 through September 27, 2011, totaling approximately $1,667,000. Two of those individuals – including one who controls the two entities – have been contacted to date and they advised that all money they sent to LOCUST MANAGEMENT was for investment on their behalf. Investigation concerning the others is still ongoing. However, the fact that the funds deposited to the LOCUST MANAGEMENT account were either in the form of checks payable to LOCUST MANAGEMENT or wires sent to that account are indicative of funds sent for purposes of investment, not for HICKS' personal use. Information contained on three of those wires reflects that those funds came from investment accounts.

34.     Nearly all of that money was transferred within a short time to one of HICKS' personal bank accounts. From those personal accounts, HICKS has used at least $230,000 to pay his personal American Express credit card bill, used approximately $86,000 to lease a Ferrari

automobile, paid $88,939.52 to Land Rover of Peabody, and made over $34,500 in cash withdrawals.

35.    The information obtained to date reflects that HICKS has been taking funds from individuals under the auspices of LOCUST, but has been spending the money and retaining it for future personal use in his bank accounts, instead of investing it. Based on all the information summarized above, there is probable cause to believe that HICKS has engaged in a scheme to defraud and gained substantial monies in his effort.

36.    On October 26, 2011, a search warrant was executed at the 10 Concord Avenue, Cambridge, MA location and HICKS was informed of the criminal investigation, as well as a civil lawsuit filed against him the same day by the Securities and Exchange Commission in Boston.

37.    On October 27, 2011, HICKS purchased an airline ticket and boarded a flight to Switzerland, with a layover in Toronto, Canada.

## CONCLUSION

38. Based on the foregoing, I have probable cause to believe that **HICKS** has committed the offense of wire fraud in violation of Title 18, United States Code, Sections 1343 and 2.

Signed under the pains and penalties of perjury this 27 day of October, 2011.

Kevin M. McCusker
Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me this 27 day of October, 2011.

United States Magistrate Judge

11